## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **SHARON K. DRAUGHN,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:11CV00029 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By:  James P. Jones |
| **COMMISSIONER OF** ) | United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

*Lewey K. Lee, Lee & Phipps, P.C., Wise, Virginia, for Plaintiff. Nora Koch, Acting Regional Chief Counsel, Region III, Adam Siry, Assistant Regional Counsel, and Alexander L. Cristaudo, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Sharon K. Draughn filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433 (West 2011).  Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

Draughn filed for benefits on February 20, 2008, alleging that she became disabled on January 1, 2006.  Her claim was denied initially and upon reconsideration.  Draughn received a hearing before an administrative law judge ("ALJ"), during which Draughn, represented by counsel, and a vocational expert testified.  The ALJ denied Draughn's claim, and the Social Security Administration Appeals Council denied her Request for Reconsideration.  Draughn then filed her Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed.  The case is ripe for decision.

II

Draughn was born on April 23, 1955, making her a younger person under the regulations.  20 C.F.R. § 404.1563(c) (2010).  Draughn completed her GED[1] and has worked in the past as a licensed practical nurse and a secretary.  She originally claimed she was disabled due to fibromyalgia, anemia, irritable bowel syndrome, hypothyroidism, and B12 vitamin deficiency.

In July 2006, Draughn sought treatment from Janice Payne, FNP.  Draughn reported that she was "doing well" and that her depression over her mother's recent death was "much improved."  (R. at 208.)

---

[1] Draughn also received nursing training.

Draughn was treated by gynecologist Katherine Scruggs, M.D., in September 2006. Dr. Scruggs reported no significant conditions and a pap smear and mammogram were both normal.

In May 2007, Draughn returned to Payne for complaints of neck pain, shoulder pain, sporadic right elbow pain, and a sinus infection. Payne recommended a series of X rays.

In June 2007, X rays of Draughn's sinuses, left shoulder, right shoulder, and right elbow were normal. An X ray of Draughn's cervical spine revealed cervical spondylosis and disc space narrowing at C5-C6.

Draughn sought treatment with Thomas E. Renfro, M.D., beginning in October 2007. Dr. Renfro noted chronic iron deficiency anemia, a history of liver cysts, goiter, fatigue, and joint pains. He indicated that Draughn had no complaints of anxiety, nervousness, or depression. A physical examination was generally unremarkable.

In November 2007, Draughn sought treatment with Sapna Patel, M.D., for complaints of fatigue and nausea. Draughn reported no back or joint pain, and she had normal ranges of motion without swelling or tenderness. Dr. Patel diagnosed Draughn with refractory anemia, hypothyroidism, and irritable bowel syndrome. He suggested intravenous iron treatments.

In January 2008, Draughn returned to Dr. Renfro for a follow up visit. Draughn complained of pain and swelling in her hands and feet, as well as low back pain. Dr. Renfro reported that intravenous iron treatments had significantly improved Draughn's anemia.

Donald Williams, M.D., a state agency physician, reviewed Draughn's medical records in May 2008. He opined that Draughn was capable of performing a range of light work and had no significant limitations. In November 2008, another state agency physician, Michael Hartman, M.D., independently reviewed Draughn's medical records and agreed with Dr. Williams' assessment.

In June 2008, Draughn complained of headaches with associated nausea and vomiting, as well as pain in her feet, hands, and lower back. Dr. Renfro noted that Draughn had no complaints of anxiety, nervousness, or depression. (R. at 293.) A physical examination was generally unremarkable.

Draughn sought treatment with Jeffry D. Bieber, M.D., at Arthritis Associates of Kingsport in January 2009. She reported pain in her shoulders, neck, hips, chest, and "all over." (R. at 304.) Draughn also complained of fatigue, difficulty sleeping despite taking Ambien, swelling in her knees, frequent headaches, alternating diarrhea and constipation, and nausea. Dr. Bieber diagnosed Draughn with fibromyalgia. He suggested non-pharmacologic treatment including regular exercise. At a follow-up visit in February 2009, Draughn

reported that she was doing "better." (R. at 303.)  In June 2009, Dr. Bieber noted that Cymbalta was helping to control Draughn's fibromyalgia.  (R. at 316-17.)

Draughn sought treatment with Daryl Pierce, M.D., in March 2009.  Dr. Pierce diagnosed Draughn with iron deficiency, right hand pain, and hypothyroidism.

In July 2009, an ultrasound study of the right upper quadrant of the abdomen revealed multiple cysts in the liver.  No intrahepatic duct dilation was noted. Draughn's gallbladder was normal in appearance.

In March 2010, Draughn complained of mental symptoms for the first time. She complained of depression to Dr. Bieber, who referred her to a psychologist. (R. at 356.)  There is no evidence in the record that Draughn ever followed through with this referral.

In May 2010, Wayne Lanthorn, Ph.D., conducted a psychological evaluation at the request of Draughn's attorney.  Draughn complained of chronic fatigue, depression, crying spells, and anxiety.  Dr. Lanthorn diagnosed Draughn with major depressive disorder, generalized anxiety disorder, pain disorder, and borderline intellectual functioning.  He assigned a GAF score of 50.[2]  Dr. Lanthorn

---

[2] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious

noted that Draughn had "never received any formal psychiatric or psychotherapeutic" treatment. (R. at 382.) He also reported that Draughn exhibited no signs of ongoing psychotic processes or any evidence of delusional thinking, and that she denied any suicidal or homicidal ideations.

Dr. Lanthorn also completed a medical assessment of Draughn's ability to do mental work related activities. Dr. Lanthorn opined that Draughn would have significant limitations in her ability to make occupational, performance, and personal/social adjustments.

At the administrative hearing held in June 2010, Draughn testified on her own behalf. Draughn discussed her medical conditions, indicating that medication brought some relief for her pain. Robert Jackson, a vocational expert, also testified. He classified Draughn's past work as a secretary as sedentary, skilled.

After reviewing all of Draughn's records and taking into consideration the testimony at the hearing, the ALJ determined that she had severe impairments of obesity, liver disease, fibromyalgia, degenerative disc disease, and anemia, but that none of these conditions, either alone or in combination, met or medically equaled a listed impairment.

Taking into account Draughn's limitations, the ALJ determined that Draughn retained the residual functional capacity to perform a range of light work.

impairment in social, occupational, or school functioning. See Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

However, the ALJ stated that Draughn could not crawl, climb ladders, ropes, or scaffolds, or perform work with concentrated exposure to hazards. She was limited to jobs that did not require more than occasional balancing, kneeling, crouching, stopping, bending, or climbing stairs. The vocational expert testified that someone with Draughn's residual functional capacity could perform her past relevant work as a secretary. Relying on this testimony, the ALJ concluded that Draughn was not disabled under the Act.

Draughn argues the ALJ's decision is not supported by substantial evidence because the ALJ failed to give proper weight to the medical opinion of Dr. Lanthorn, and failed to give appropriate consideration to Draughn's obesity. For the reasons below, I disagree.

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing DIB claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. § 404.1520(a)(4) (2011). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id.*; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.* at 869.

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1956-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Draughn argues that the ALJ's decision is not supported by substantial evidence. She presents two arguments.

First, Draughn argues that the ALJ improperly substituted his own opinion for that of a medical professional. Specifically, Draughn asserts that the ALJ failed to give proper weight to the opinion of Dr. Lanthorn on the severity of her mental impairments.

In weighing medical opinions, the ALJ must consider factors such as the examining relationship, the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record. 20 C.F.R. § 404.1527(d) (2011). In the case of a consultative source, the ALJ has even wider discretion, since only a treating source's opinion is entitled to controlling weight. *Id*.

In the present case, the ALJ considered the opinion of Dr. Lanthorn but gave little weight to his assessment for several reasons. First, Dr. Lanthorn's relationship with Draughn was limited — his opinion was based on a one-time examination, made at the request of Draughn's attorney. Second, Dr. Lanthorn's

opinion is inconsistent with his own mental evaluation as well as the other medical evidence of record. For instance, Dr. Lanthorn assessed a GAF score of 50, indicating serious symptoms or limitations; yet he noted that Draughn exhibited no signs of ongoing psychotic processes, delusional thinking, or suicidal or homicidal ideations, and that she had never received any formal psychiatric or psychotherapeutic treatment. (R. at 378-89.) Furthermore, Dr. Lanthorn's opinion is dated May 25, 2010, over a year after Draughn's date last insured.[3] Thus, even if the ALJ gave full credit to Dr. Lanthorn's opinion, it could not establish that Draughn was entitled to benefits under the Act because, at best, it only provides evidence for functional limitations one year after her date last insured.

Second, Draughn contends that the ALJ failed to give appropriate consideration to Draughn's obesity. I find this argument unpersuasive. The ALJ explicitly evaluated Draughn's obesity when he listed it as a severe impairment. (R. at 16.) The ALJ also considered the effect of Draughn's obesity in relation to her other physical impairments when he determined that Draughn had the residual functional capacity to perform only light work. (R. at 18-20.) Furthermore, Draughn's numerous daily living activities, such as doing laundry, washing dishes,

---

[3] There is no evidence in the record that Draughn's alleged mental impairments imposed any functional limitations during the relevant period. Draughn's only other complaints of mental symptoms were to Dr. Bieber beginning in March 2010. However, these complaints were also nearly one year after her date last insured. (R. at 356.)

and fixing her own meals, contradict her claims of disabling obesity. (R. at 148, 150.)  Accordingly, I find that substantial evidence supports the ALJ's finding.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted.  A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED:   March 20, 2012

/s/  James P. Jones
United States District Judge